Dated: December 20, 2010



_____
**RANDOLPH J. HAINES**
**U.S. Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AGA MANAGEMENT, LLC, | ) | CASE NO. 2:10-bk-34580-RJH |
| | ) | |
| Debtor. | ) | MEMORANDUM DECISION ON |
| | ) | OWNERSHIP OF REVENUES |

Pending before the Court is the issue of whether the revenues generated through the Debtor's management of the Papago Golf Course constitute cash collateral prior to their being deposited in the escrow account created by the Revenue Fund Agreement. All parties seem to agree, however, that those golf course revenues are not cash collateral, albeit for different reasons. The City of Phoenix and Compass Bank assert the revenues are not cash collateral because they are not property of the estate. They contend the revenues are held in trust by the Debtor, and such trust funds are excluded from property of the estate by virtue of Code § 541(d). On the other hand, although the Debtor contends the revenues are property of the estate, the Debtor contends they are not cash collateral because they are not pledged to secure any debt. Although § 11.2 of the Operating Agreement does expressly grant the City a security interest in all Gross Revenues, the Debtor argues that security interest was never perfected, and the City agrees not only that it was never perfected but also that it was never actually intended but was merely a mistake arising from use of a form document.

Based on this agreement of the parties, the Court finds and concludes that the golf course revenues[1] are not cash collateral whose use is governed by Code §§ 363(a) and 363(c)(2).

While this may resolve the only issue currently pending before the Court, it appears necessary to further progress in this case for the Court to determine whether such revenues (prior to their being deposited in the escrow account established by the Revenue Fund Agreement) are technically owned by the Debtor, or are owned by the City, or are held by the Debtor subject to a trust in favor of the City. To assist the parties on an interlocutory basis, and without prejudice to a different conclusion in any specific context or for any specific purpose, the Court finds and concludes that the revenues are property of the Debtor and of the estate, not subject to any express or resulting trust.

All parties agree there is no express language in either the Operating Agreement or the Revenue Fund Agreement that expressly provides who owns the golf course revenues. All parties also agree that the golf course revenues are not rents that are paid either by Debtor or by the golfers. The parties also agree that the use and application of those revenues are very highly regulated by the Operating Agreement; not presently before the Court is the issue of whether there may be any deviations from those defined applications and uses.

Paragraph 7.1.1 of the Operating Agreement seems clearly to imply that the revenues derived by the operation of the Debtor's business at the Facility are the Debtor's funds. Perhaps more important, that paragraph clearly implies that it is the *Debtor's* business that is being operated at the Facility, not the City's business. For example, that paragraph expressly provides:

> Operator shall operate the Facility as a municipal golf course and shall be the sole manager and operator of such business. Operator shall be solely responsible for and with full control and discretion in the operation, direction, management and supervision of the Site and the Facility and its staff, subject to the terms of this agreement. . . .

---

[1] This term, "golf course revenues," is intended to include both what the Operating Agreement defines as Golf Revenues as well as all other revenues generated by Facility operations other than Golf Revenues, which is apparently what are defined to be "Gross Revenues" in paragraph 11.1 of the Operating Agreement. The term also refers to such revenues only prior to their being deposited in the escrow account established by the Revenue Fund Agreement.

2
Case 2:10-bk-34580-RJH    Doc 71    Filed 12/20/10    Entered 12/21/10 10:23:57    Desc
Main Document    Page 2 of 4

> Operator shall collect all revenue from <u>its business</u> and pay all expenses; . . . employ, pay, supervise and discharge all personnel Operator determined to be necessary for the operation of <u>its business</u>, the Site and the Facility . . .; and maintain or cause to be maintained all necessary licenses, permits and authorizations for the operation of <u>its business</u>, the Site and the Facility. (Emphasis added).

This language seems unequivocally to imply that it is the Debtor's business that is being operated at the Facility and that generates the revenues. It does not imply that the Debtor is operating the City's business, in trust for the City. This, in turn, implies that the revenues would be the Debtor's, absent some express language providing to the contrary.

Other aspects of the Operating Agreement provide similar implications. Although the parties did not address the issue and the Debtor's parent is apparently a § 501(c)(4) entity, it appears that if the Debtor were a tax-paying entity it would be the Debtor who would be liable for any taxes arising from its operations, including both income taxes and transaction privilege taxes, if any. And *all* revenue generated from the operation of the Facility is treated alike and all must similarly be deposited in the revenue fund pursuant to paragraph 11.1 of the Operating Agreement. Yet some of that revenue may be derived from the sale of refreshments, souvenirs, apparel and golf related equipment, pursuant to paragraph 7.3.1 of the Operating Agreement. It appears to be the intent of the Operating Agreement that all of those items that may be sold at the Facility would first be purchased by the Debtor for such sale. It does not appear that these refreshments and goods are owned by the City prior to their sale. Yet it would take some very clear and unequivocal language to dispel the presumption that if the Debtor purchases a tee-shirt for $10.00, and resells it for $20.00, that revenue would belong to someone other than the entity that purchased, owned and sold the item. And, as noted, nothing in the Operating Agreement suggests that revenues generated from greens fees or golf cart rentals are any different than revenues generated from the sale of the Debtor's own tee shirts.

Finally, although the labels used by parties are not necessarily determinative, there is no language in the Operating Agreement suggesting that the revenues are trust funds, that the Debtor is employed as a trustee, or that the Debtor's role is any more fiduciary in nature than that of an ordinary contracting party. To the contrary, paragraph 20.3 expressly states that the

3

"relationship created hereby is solely that of owner-independent contractor."

Finally, these conclusions are supported by the structure of the financing. Compass Bank is secured by the Operating Agreement, not by the golf course revenues. Presumably, this is because the only valuable collateral available to secure Compass Bank was not the gross revenues that are owned by the City according to the City's argument, but rather the income that can potentially be generated by performance of the Operating Agreement. That also implies that the revenue is generated by the Debtor and belongs to the Debtor, rather than to the City. If there were a revenue stream owned outright by the City, it would have been a far simpler and more effective security simply to pledge that collateral, rather than the cumbersome and ill-defined process of attempting to pledge an executory contract.

For these reasons, on a interlocutory basis without prejudice to reconsideration in any specific context, the Court finds and concludes that the golf course revenues as defined herein belong to the Debtor and to the estate and are not subject to any trust prior to their being deposited in the escrow account created by a Revenue Fund Agreement.

DATED AND SIGNED ABOVE

Copy of the foregoing e-mailed
this 20th day of December, 2010, to:

John J. Hebert, Esq.
Polsinelli Shughart, P.C.
Attorneys for AGA Management, LLC
jhebert@polsinelli.com

Brian Sirower, Esq.
Quarles & Brady LLP
Attorney for Compass Bank
brian.sirower@quarles.com

Madeleine C. Wanslee, Esq.
Gust Rosenfeld, P.L.C.
Attorneys for City of Phoenix
mwanslee@gustlaw.com

Sonia M. Blain, Esq.
Office of the City Attorney
sonia.blain@phoenix.gov

 /s/ Pat Denk
Judicial Assistant